**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Edward A. Chambers, Jr.,

Plaintiff,

v.

Metropolitan Property and Casualty Insurance Co., and St. Paul Fire and Marine Insurance Co.,

Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 00-2111 ADM/SRN

---

William J. Mavity, Esq., Mavity & Associates, Minneapolis, Minnesota, appeared for and on behalf of the Plaintiff.

Marko J. Mrkonich, Esq., and Heather C. Sherman, Esq., Littler Mendelson, P.C., Minneapolis, Minnesota, appeared for and on behalf of the Defendants.

---

## I. INTRODUCTION

On March 18, 2002, the undersigned United States District Judge heard a Motion for Summary Judgment [Doc. No. 13] by Defendants Metropolitan Property and Casualty Insurance Co. ("Met") and St. Paul Fire and Marine Insurance Co. ("St. Paul"). Defendants seek summary judgment on Plaintiff Edward A. Chambers, Jr.'s ("Chambers") claims for: (1) age discrimination, (2) breach of contract, (3) unpaid bonus under Minn. Stat. § 181.13, and (4) unjust enrichment. For the reasons articulated below, Defendants' motion is granted.

## II. BACKGROUND

As required in the summary judgment context, the following facts are reviewed in the light most favorable to Chambers. In the summer of 1998, after his position with USF&G Company was eliminated due to a merger, St. Paul hired Chambers as the Director of Procedures

FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

and Underwriting Analysis. *See* Chambers Dep., at 29, 31-32, 97-98. St. Paul paid for Chambers to relocate from Florida to his new position Minnesota. Chambers celebrated his 50th birthday on October 7, 1998. The severance policy in effect at that time provided that if Chambers lost his job within the next 12 months, St. Paul would pay for relocation expenses Chambers incurred as a result, in an amount equal to the expenses Chambers incurred during his initial relocation. *Id.* at 110-12. The severance benefits plan upon which Chambers bases his claim, issued in March 1999, provides:

> If you relocate at [St. Paul's] request and your job involuntarily terminates due to a reduction in workforce or job elimination within 24 months of your relocation, [St. Paul] will provide the same relocation benefits toward your second relocation as it did for your first relocation. You are eligible for this benefit as long as you relocate within three months of your termination date, and your second relocation is to a primary residence within the 48 continental states of the United States of America.

Chambers Dep. Ex. 12 (St. Paul Employee Benefits Program Booklet), at 321. The plan also states that St. Paul could "revise, modify, or terminate the severance plan at any time with or without notice." *Id.* at 318.

In the summer of 1999, St. Paul announced the sale of its personal insurance operations to Met. The merger resulted in the elimination of St. Paul positions which were already staffed at Met. Since Met was not making any organizational changes, Chambers' management position was going to be eliminated. From the closing date of the sale on October 1, 1999, through December 31, 1999, Met leased St. Paul's personal insurance operations staff, including Chambers. The leased employees from St. Paul helped Met deal with the expanded volume of work created by Met's purchase of St. Paul, while Met decided which employees from St. Paul to hire for its own operations.

Met's Chief Underwriter and Vice-President, Michelle DeWine, interviewed each employee on St. Paul's corporate underwriting staff. *See* DeWine Dep., at 4-5, 39, 52. Although Met did not have available positions in management for Chambers, DeWine interviewed him for a position in compliance. *Id.* at 92. DeWine did not hire Chambers for the compliance position. She selected an employee under age 40 to fill the position.

Following the acquisition of St. Paul, Met was expanding its market strategist department. Chambers interviewed with Met's Assistant Vice President of Market Strategy, Ken Bokor, for a market strategist position based in Florida. *See* Bokor Dep., at 92-96, 99-100. Bokor did not hire Chambers. He hired a person under age 40 for the market strategist position based in Florida.

On October 19, 1999, Chambers received notice that his employment with St. Paul was terminated effective December 10, 1999, as part of the reduction in force. After his age discrimination charge with the EEOC was dismissed, Chambers filed this action on September 11, 2000. He alleges claims for discrimination based on age, breach of contract, unpaid bonus, and unjust enrichment.

**III. DISCUSSION**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**A. Age Discrimination**

The Age Discrimination in Employment Act ("ADEA") prohibits an employer from discriminating on the basis of a person's age, if such an individual is over 40 years old. *See* 29 U.S.C. § 631(a). The ADEA states in part that "[i]t shall be an unlawful employment practice for an employer [to] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). To establish a claim under the ADEA, Chambers must show that Defendants intentionally discriminated against him. *Ziegler v. Beverly Enterprises-Minnesota, Inc.*, 133 F.3d 671, 675 (8th Cir. 1998). Chambers concedes that no one at St. Paul or Met ever referred to Chambers' age or made any age-related comments. *See* Chambers Dep., at 28-29.

Where a plaintiff lacks direct evidence of intentional discrimination, the three-step *McDonnell Douglas* burden-shifting analysis applies.[1] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993); *Euerle-Wehle v. United Parcel Serv.*, 181 F.3d 898, 900 (8th Cir. 1999). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Cronquist v. City of Minneapolis*, 237 F.3d 920, 924 (8th Cir. 2001). Once a prima facie case is established, a rebuttable presumption shifts the burden to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. *Id.* If the employer

[1] Analysis of discrimination claims under the Minnesota Human Rights Act ("MHRA"), Minn.Stat. § 363.03, is the same as that under the ADEA. *See Ziegler*, 133 F.3d at 675 (using the same analysis for claims under the ADEA and the MHRA); *Todd v. Ortho Biotech. Inc.*, 175 F.3d 595, 599 (8th Cir. 1999) (noting that Minnesota courts frequently look to federal cases when interpreting the MHRA).

articulates such a reason, the presumption disappears and the plaintiff bears the burden of proving that the employer's proffered reason is merely a pretext for discrimination. *Id.*

To establish a prima facie case of age discrimination, a plaintiff must demonstrate that: (1) he is within the protected class; (2) he was qualified to perform his job; (3) he suffered an adverse employment action; and (4) a younger person was not treated the same. *Fisher v. Pharmacia & Upjohn,* 225 F.3d 915, 919 (8th Cir. 2000); *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999). There is no dispute that Chambers is over 40 years old and within the protected class. However, Chambers lacks evidence sufficient to demonstrate other required elements of the prima facie case.

**1. Reduction in Force**

It is undisputed that St. Paul terminated all of its personal insurance employees after Met purchased St. Paul's personal insurance operation and that Met eliminated Chambers' position as part of a reduction in force. In a reduction in force situation, a plaintiff must make "some additional showing" that age discrimination was a factor in his termination. *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 427 (8th Cir. 1999). A company may exercise its business judgment legitimately by deciding to reduce its work force, even without proof of financial distress. *Regel v. K-Mart Corp.,* 190 F.3d 876, 880 (8th Cir. 1999). "The ADEA does not require that every plaintiff in a protected age group be allowed a trial simply because he was discharged during a reduction-in-force." *Holley v. Sanyo Mfg., Inc.*, 771 F.2d 1161, 1165-66 (8th Cir. 1985). The Eighth Circuit has held that the "some-additional-showing element tailors the prima facie case to ensure that it raises a rational inference of intentional age discrimination."

*Walton*, 167 F.3d at 427; *see Yates v. Rexton, Inc.*, 267 F.3d 793, 799 (8th Cir. 2001).

Chambers points to "statistical" evidence of age discrimination by highlighting the number of employees over age 40 who were listed in the notice Chambers received with his severance offer. *See* Chambers Dep., at 28, 213-14. Chambers' purported statistical evidence of the age of employees affected by the reduction in force does not create a reasonable inference of age discrimination. The numbers reflect approximately half of the employees in St. Paul's personal insurance operation. The more significant statistic in the reduction in force context is the difference in the percentage of older employees in the total work force before and after the reduction in force. *EEOC v. McDonnell Douglas Corp.*, 191 F.3d 948, 952 (8th Cir. 1999). Chambers lacks supporting evidence regarding the overall age of the employees both before and after the reduction in force. *See Hanebrink v. Brown Shoe Co.,* 110 F.3d 644, 646 (8th Cir. 1997) (finding no statistical basis for age discrimination claim where average age of employees declined by only one-half year after layoffs). Chambers fails to establish the requisite "some additional showing" to raise a rational inference of intentional age discrimination.

Moreover, Chambers has insufficient evidence of pretext. Defendants' decision to reduce the work force is a legitimate, nondiscriminatory reason for the elimination of Chambers' position. "[I]t is not the role of this court to sit as a 'super-personnel department' to second guess the wisdom of a business's personnel decisions." *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 957 (8th Cir. 2001). Chambers has not produced any evidence that Defendants' reduction in force was based on employee age or that the reasons for it were false. Chambers failed to set forth evidence sufficient to create a genuine issue of fact as to whether Defendants' reduction in

force was a pretext for age discrimination.

**2. Failure to Hire**

Chambers next alleges that Met denied him new, alternative positions based on his age. To establish a failure to hire claim, Chambers must demonstrate that (1) he belonged to the protected class; (2) he was qualified for the positions for which he applied; (3) he was not hired for the position applied for despite his being sufficiently qualified; and, (4) the employer finally filled the position with a person sufficiently younger to permit an inference of age discrimination. *Schiltz v. Burlington Northern R.R.*, 115 F.3d 1407, 1412 (8th Cir. 1997). There is no dispute that Chambers was over 40 years old and was not hired for the position. However, Chambers has not shown that he was as equally qualified as the persons Met actually hired in the positions.

Met's Chief Underwriter and Vice-President, Michelle DeWine, interviewed Chambers for a position in compliance. DeWine believed Chambers lacked the qualities she believed necessary for the compliance position, specifically, she felt Chambers did not possess the interpersonal skills necessary to perform the duties. *See* DeWine Dep., at 87-88. DeWine also believed Chambers was overqualified for the position. *Id.* at 82. DeWine selected Pamela Johnson for the compliance position based on her assessment that Johnson had a composed, patient demeanor which was well-suited to working with regulators challenging the compliance department's decisions. *Id.* at 87-89. Further, DeWine found that Johnson had more experience in the type of work performed in the compliance position. *Id.* at 65, 83.

Met's Assistant Vice President of Market Strategy, Ken Bokor, interviewed Chambers for

a market strategist position based in Florida. Bokor believed Chambers' intense interpersonal style did not match Met's needs for the position.[2] Bokor Dep., at 92-96. Bokor hired Will Daniel for the market strategist position in Florida. *Id.* at 30. Daniel had 15 years of experience working in sales development in Florida. *Id.* at 58. As a Met employee, Daniel possessed knowledge of the Florida market, agency plan, and sales development strategies. *Id.* Moreover, Daniel had a working relationship with Met's underwriting, claims, and pricing departments in Florida. *Id.* In contrast, Chambers had less recent experience in Florida and no working relationship with Met staff.

Met exercised business judgment in hiring Johnson and Daniel instead of Chambers. Courts should not act as a "super-personnel department," revisiting the wisdom or fairness of employment decisions, except when intentional discrimination is involved. *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995) ("[E]mployers have wide latitude to make business decisions."). Chambers failed to present evidence suggesting pretext with regard to Defendants' legitimate, nondiscriminatory reasons for their hiring decisions. Chambers' favorable past work performance reviews with St. Paul do not suggest that Met's reasons for not hiring him for different positions with Met are false. There is insufficient evidence from which to infer intentional discrimination under the circumstances of this case.

[2] Bokor did not consider Chambers for the market strategist positions in Illinois or Minnesota because in his interview Chambers had focused on Florida and his relevant experiences there. Chambers admitted he did not express interest in any states other than Florida. *See* Chambers Dep., at 183.

**B. Breach of Contract**

Chambers argues that Defendants breached his severance plan by refusing to pay him relocation benefits. Before reaching the merits of Chambers' breach of contract claim, however, it must be determined whether the claim is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), because it relates to an "employee benefit plan" under 29 U.S.C. § 1144(a). *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 43-45 (1987) (holding that ERISA preempts state common law contract actions relating to employee benefit plans); *Massachusetts v. Morash*, 490 U.S. 107, 116 (1989) (holding that plans to pay employees severance benefits upon termination of employment are employee welfare benefit plans within the meaning of ERISA). A severance plan qualifies as an employee welfare benefit plan under ERISA when benefits are distributed through an "ongoing administrative program to meet the employer's obligation." *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 934-35 (8th Cir. 1999). A plan is likely to implicate ERISA where "no single event triggers a one-time payment of benefits to all participants." *Id.* at 935.

The severance benefits plan upon which Chambers bases his claim provides that "[i]f you relocate at [St. Paul's] request and your job involuntarily terminates due to a reduction in workforce or job elimination within 24 months of your relocation, [St. Paul] will provide the same relocation benefits toward your second relocation as it did for your first relocation." Chambers Dep. Ex. 12 (St. Paul Employee Benefits Program Booklet), at 321. The plan conditions the severance benefit on relocating within three months of the termination date and moving to a primary residence within one of the 48 continental states. *Id.* Because of the need

for individualized inquiries into a terminated employee's qualifications for benefits, the plan necessarily contemplates an ongoing administrative program. *See Emmenegger*, 197 F.3d at 935. The plan manifests a continuing need for processing requests and making payments to terminated individuals who meet the conditions. *See id.* The relocation severance benefit is not awarded "automatically and mechanically upon termination." *Id.* Thus, St. Paul's severance benefit plan qualifies as an employee welfare benefit plan. Chambers' breach of contract claim is preempted by ERISA because it relates to this plan. *See Pilot Life Ins.*, 481 U.S. at 43-45.

Even if it was not preempted by ERISA, Chambers' breach of contract claim fails on the merits. The plan states that St. Paul could "revise, modify, or terminate the severance plan at any time with or without notice." Chambers Dep. Ex. 12 (St. Paul Employee Benefits Program Booklet), at 318. St. Paul reserved its right to change the terms of the severance policy at any time without notice. *See Feges v. Perkins Restaurants, Inc.*, 483 N.W.2d 701, 708 (Minn. 1992) ("[E]mployers may modify the terms of contracts created by employee handbooks without great difficulty."); *see also In re Air Transp. Excise Tax Litig.*, 37 F.Supp.2d 1133, 1142 (D. Minn. 1999) (rejecting claim for breach of contract where contract unambiguously reserved right to change provision).

Chambers was ineligible for relocation benefits under the terms of the severance plan, as modified before Met leased employees from St. Paul. On September 27, 1999, St. Paul amended the severance plan, creating a separate list of benefits for St. Paul employees who were leased to Met. *See* Chambers Dep. Ex. 39, at 21. The amended plan provided that the management employees leased by Met who received notice of termination "on or after" the closing date of

Met's purchase of St. Paul and "prior to January 1, 2000" were eligible to receive a basic severance benefit and an additional lump sum severance payment. *Id.* The amended plan stated that no other benefits were available to leased employees. *Id.* Thus, Chambers was not eligible for relocation benefits because he was an employee leased by Met who received notice of termination on or after the closing date and prior to January 1, 2000.

**C. Unpaid Bonus**

Chambers alleges a claim for an unpaid bonus under Minnesota's wage and hour law, which requires payment of wages "actually earned and unpaid at the time of discharge." Minn. Stat. § 181.13(a). The terms of the employer's own compensation plan may be used in determining whether the employee had earned the compensation. *Holman v. CPT Corp.*, 457 N.W.2d 740, 743 (Minn. Ct. App. 1990). Chambers concedes that the annual incentive plan provided that bonuses were only paid to participants who were still employed by the company as of the last day of the plan year and on the date of the bonus pay-out. *See* Chambers Dep., at 68, 122-23, Ex. 13. Chambers' ineligibility for a bonus because he was not an employee at the end of the year requires that summary judgment be granted for Defendants.

**D. Unjust Enrichment**

To establish a claim for unjust enrichment, Chambers must show that Defendants knowingly received something of value to which they were not entitled, and that the circumstances are such that it would be unjust for them to retain the benefit. *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996). "[U]njust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term 'unjustly'

could mean illegally or unlawfully." *First Nat'l Bank v. Ramier,* 311 N.W.2d 502 (Minn. 1981). As discussed above, Chambers' claims for relocation benefits and a prorated bonus fail as a matter of law. Accordingly, Defendants were not wrongfully enriched. Chambers has set forth no evidence that Defendants, rather than willing buyers and sellers of the stock, were enriched by his compelled exercise of his stock options at a time when the market price was low. Chambers lacks evidence that Defendants received something of value from Chambers under circumstances in which it would be inequitable for Defendants not to pay for it. Summary judgment is granted.

**E. The Local Rules**

"No party shall file a memorandum of law exceeding 35 pages except by permission of the Court." D. Minn. LR 7.1(c). The Local Rules further provide that "[i]f a reply memorandum of law is filed, the cumulative total of the original memorandum and the reply memorandum shall not exceed 35 pages, except by permission of the Court." *Id.* Such memoranda of law are required to be double spaced. D. Minn. LR 7.1(e). Footnotes and quoted materials may be single spaced. *See* D. Minn. LR 5.1. By including single spaced arguments in the memoranda, counsel for Defendants have not heeded these rules in their submissions. *See* Def. Mem. in Supp., at 3; Def. Reply Mem., at 2-3. The Memorandum in Support and the Reply Memorandum may comply with the letter of the rules, but offend their spirit, employing nineteen footnotes with lengthy single spaced text in the former and twelve footnotes with lengthy single spaced text in the latter. *See* Def. Mem. in Supp., at 1-24; Def. Reply Mem., at 1-11. Counsel is admonished to follow the line spacing requirements and page limitations contained in the Local Rules.

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 13] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Dated: June 13, 2002

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd

## *Featured Speakers Include:*

District of Minnesota

Judge David S. Doty

Judge Donovan W. Frank

Judge Paul A. Magnuson

Judge Ann D. Montgomery

Judge John R. Tunheim

Chief Magistrate Judge Jonathan Lebedoff

Magistrate Judge Arthur J. Boylan

United States Bankruptcy Court
District of Minnesota

Judge Robert J. Kressel

Application Pending for 7.5 CLE Credits including 2 Ethics and 1 Bias Credit

The Minnesota Chapter of the Federal Bar Association
c/o Kelly & Berens, P.A.
80 S. 8th Street, Suite 3720
Minneapolis, MN 55402

NON-PROFIT
ORGANIZATION
U.S. POSTAGE
PAID
Minneapolis, MN
Permit No. 2657

MINNESOTA CHAPTER OF THE FEDERAL BAR ASSOCIATION

In connection with
The Federal Judiciary

# *28th Annual Federal Court Practice Seminar*

June 19, 2002
8:00 am—5:15 pm

Minneapolis Convention Center
1301 Second Avenue South
Room 208
Minneapolis, MN 55402
(612) 335-6000

## Morning Session:

| | |
|---|---|
| 7:30-8:00 | **Registration** |
| 8:00-8:15 | **Opening Remarks and Welcome,** ***Judge Ann D. Montgomery*** |
| 8:15-9:00 | **Securities Law Issues in the Wake of Enron,** ***Timothy J. Warren (SEC Midwest Regional Office), Professor Niels Schaumann (William Mitchell College of Law), Karl L. Cambronne (Chestnut & Cambronne)*** |
| 9:00-9:45 | **Current Issues in Employment Law,** ***Judge Paul A. Magnuson, Linda L. Holstein (Parsinen Kaplan Rosberg & Gottlieb PA), John R. McDonald (Meagher & Geer, PLLP), Daniel Oberdorfer (Leonard, Street and Deinard)*** |
| 9:45-10:00 | **Morning Break** |
| 10:00-10:45 | **Current Initiatives in the U.S. Attorneys' Office,** ***Tom Heffelfinger (U.S. Attorneys Office)*** |
| 10:45-11:45 | **Discovery Disputes: Professionalism in the Practice of Law?,** ***Judge David S. Doty, Chief Magistrate Judge Jonathan Lebedoff, Magistrate Judge Arthur J. Boylan,*** |
| 11:45-12:45 | **Lunch (Room 211)** |

11:45-12:45 Lunch (Room 211)

## Afternoon Session:

| | |
|---|---|
| 12:45-1:30 | **The Clerk's Office Can Be Your New Best Friend,** ***Celeste Shahidi, Lou Jean Gleason, Mary Lenner, Gertie Simon, Andy Seldon*** |
| 1:30-2:15 | **How to Effectively Teach and Persuade in Patent or Intellectual Property Cases: Why, When and How,** ***Judge Donovan W. Frank, Becky R. Thorson (Robins, Kaplan, Miller & Ciresi), Stephen J. Davidson (Leonard, Street and Deinard)*** |
| 2:15-3:15 | **Issues in the Wake of 9/11: Racial Profiling --** ***Daniel M. Scott (U.S. Federal Public Defenders' Office)***; **Response by the Department of Justice --** ***Tony Brown (U.S. Attorneys Office)*** |
| 3:15:3:30 | **Afternoon Break** |
| 3:30-4:15 | **Update on Technology Tools for Litigating in Federal Court,** ***Judge John R. Tunheim, Judge Robert J. Kressel, Eric J. Magnuson (Rider, Bennett, Egan & Arundel)*** |
| 4:15-5:15 | **Ethics in "Real Life" Practice Situations,** ***Martin A. Cole (Lawyers Professional Responsibility Office)*** |

## Seminar Registration

☐ Member $195.00
☐ Non-Member $225.00

Name ______________________
Firm/Employer ______________________
Address ______________________
______________________
Phone ______________________
E-Mail ______________________

Complete registration form and send with check payable to:

**Minnesota Chapter, FBA**
**c/o Nancy Gustafson**
**Kelly & Berens, P.A.**
**Suite 3720 IDS Center**
**80 South Eighth Street**
**Minneapolis, Minnesota 55402**

**Not a Member? Join the FBA**

*To apply on-line or to download application form go to http://www.fedbar.org and click on "Join the FBA."*

Questions call: Barbara P. Berens, Vice President, Planning, Minnesota Chapter FBA (612)-349-6171

**Annual Seminar Planning Committee:**

Kristine M. Boylan, Meagher & Geer, P.L.L.P.

Catherine A McEnroe, Leonard, Street and Deinard

Celeste M. Shahidi, U.S. Courthouse Minneapolis Building

Susan Nolting, U.S. Department of Justice

Maureen Watz Gornik, Warren E. Burger Federal Building